IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JAYCEON W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JAYCEON W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

VINCENT W., APPELLANT.

Filed May 21, 2024.    No. A-23-739.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Matthew P. Saathoff and Jacob A. Acers, of The Saathoff Law Group, P.C., L.L.O., for appellant.

Regina T. Makaitis, for guardian ad litem.

Christine P. Costantakos, guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Vincent W. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his son, Jayceon W. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Vincent is the father of Jayceon, born in 2012. Iris J. is Jayceon's mother. Iris' parental rights to Jayceon were terminated during these same juvenile proceedings below, and that termination was affirmed on appeal. See *In re Interest of Raynya V. & Jayceon W.*, No. A-23-055, 2023 WL 5605631 (Neb. App. Aug. 29, 2023) (selected for posting to court website). Because Iris is not part of this appeal, she will only be discussed as necessary.

In April 2013, Jayceon was removed from Iris' home due to concerns that he had been exposed to drugs while in her home. On April 10, the State filed a petition alleging that Jayceon was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) because he lacked proper parental care by reason of the faults or habits of Iris. That same day, the juvenile court entered an order placing Jayceon in the custody of the Nebraska Department of Health and Human Services (DHHS) for placement in foster care. Jayceon has remained in foster care ever since, except for a few months in 2016 when he lived with Iris. See *In re Interest of Raynya V. & Jayceon W., supra.* In August 2013, Jayceon was adjudicated to be within the meaning of § 43-247(3)(a) based on Iris' admission to allegations in the petition that on or about April 2, Jayceon tested positive for amphetamine, cocaine, and cannabinoids. Iris failed to work with DHHS on a voluntary basis, and due to the above allegations, Jayceon was at risk for harm.

On March 11, 2016, the State filed a second supplemental petition alleging that Jayceon was a child within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the faults or habits of Vincent in that:

> A. Vincent . . . is currently incarcerated with a scheduled release date for sometime in June 2016.
> B. Vincent . . . has not had face to face contact with [Jayceon] since February 2015.
> C. Vincent . . . has been intermittently incarcerated during 2015.
> D. Vincent . . . has failed to provide safe and stable housing for [Jayceon].
> E. Vincent . . . has failed to provide any financial or physical care or support for the physical needs of [Jayceon].
> F. Due to the above allegations, jointly or severally, [Jayceon] is at risk of harm.

In May 2016, Jayceon was adjudicated to be within the meaning of § 43-247(3)(a) based on Vincent's admission to the allegations in parts A, D, and F of the second supplemental petition above.

Following the July 2016 disposition hearing, Vincent was ordered to: obtain and maintain safe, stable, and adequate housing and provide proof to the case manager; obtain and maintain a legal, stable source of income and provide proof to the case manager; meet with the case manager; have reasonable rights of supervised visitation; submit to a psychological evaluation by August 13; submit to random urinalysis (UAs) within 4 hours of a request by the case manager; timely notify the court of any services he deems necessary to assist with the return of the child to the parental home; and follow the rehabilitation plan of the court and also make reasonable efforts on his own to bring about rehabilitation/reunification.

Following a review and permanency planning hearing in February 2017, Vincent was also ordered to complete a budget (and timely supplements) to assist with the determination of his ability to pay for services/treatment ordered by the court, and successfully complete "Level 4" outpatient treatment. And after a hearing on August 2, he was ordered to submit to a chemical dependency evaluation by August 30.

On December 20, 2017, Jayceon's guardian ad litem (GAL) filed a motion to terminate Vincent's parental rights to Jayceon pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 2016), alleging that such termination was in the child's best interests. However, the GAL subsequently withdrew her motion to terminate Vincent's parental rights.

In May 2018, the juvenile court granted a motion to have Jayceon's visits occur in Omaha, Nebraska, while Vincent recovered from injuries incurred in a motor vehicle accident. In August, visits once again were ordered to occur in Lincoln, Nebraska.

Following a review and permanency planning hearing in August 2018, the juvenile court additionally ordered Vincent to successfully complete treatment as set forth in certain exhibits (exhibits 94 and 106), his fifth treatment program to address substance abuse; demonstrate measurable, sustained progress in treatment and not engage in conduct/behaviors which would result in unsuccessful discharge; and not engage in conduct/behaviors which would result in incarceration thus making him unavailable to participate in his rehabilitation plan. In 2019, the court ordered Vincent to participate in therapy and family therapy, and complete a bonding assessment.

On October 22, 2021, the GAL filed a motion to terminate Vincent's parental rights to Jayceon pursuant to § 43-292(2) and (7). The GAL alleged that: Vincent had substantially and continuously or repeatedly neglected Jayceon and refused to give Jayceon (or a sibling) necessary parental care and protection; Jayceon had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Vincent's parental rights was in Jayceon's best interests.

TERMINATION HEARING

The parental rights termination hearing was conducted over 12 nonconsecutive days starting on December 7, 2022, and concluding on June 1, 2023. Several witnesses were called to testify, and numerous exhibits were received into evidence. Vincent testified in his own behalf.

Gay Malone was the children and family services specialist assigned to this family from August 2019 through August 2020. When Malone took over the case, she had a case transfer meeting with her supervisor and the previous caseworker and that caseworker's supervisor. She also reviewed the records in the case file, including court orders. Malone testified that Jayceon was first placed in foster care when he was 3 months old, and he had been in foster care for 71 months when she took over this case.

According to Malone, Vincent was court-ordered to have safe and stable housing and a legal source of income, complete substance abuse treatment, complete mental health treatment, submit to random drug testing, complete a bonding assessment, participate in family therapy, avoid behavior or conduct that might result in his incarceration, and have reasonable rights of supervised visitation.

Malone stated that Vincent had a home in Omaha and he reported working for a lawn service. Vincent did not provide Malone pay stubs or canceled checks but did provide her a copy of his tax returns, however she said that "there was a lot of information redacted, crossed out, blacked out" and she did not know the source of his income. According to a DHHS court report received into evidence, Vincent reported to Malone that he had successfully completed substance use treatment but did not provide her with a discharge summary. Malone testified that Vincent had not completed mental health treatment and was not regularly participating in drug testing. Vincent reported that he was not willing to go to counseling because he was only depressed because his son was not with him. Vincent was discharged from drug testing services in March 2020; because of the COVID-19 pandemic restrictions, UAs were no longer being conducted and Vincent refused sweat patch testing. Vincent completed the bonding assessment with Dr. Cottam. He also started family therapy.

Dr. Glenda Cottam, a clinical psychologist, conducted a bonding assessment of Vincent and Jayceon in late 2019/early 2020, and her written report was received into evidence. She interviewed Vincent and Jayceon, administered certain assessments and questionnaires for each, reviewed collateral information, and observed Vincent and Jayceon interact. Dr. Cottam also had Jayceon's foster mother fill out a demographic questionnaire. Dr. Cottam testified that the interaction she observed between Vincent and Jayceon was generally positive, and "[t]here was a bond." At the time of her assessment, Dr. Cottam recommended that (1) Vincent continue to have supervised visitation with Jayceon, (2) Vincent complete an updated psychological assessment to "identify any concerns that would be helpful for reunification," and (3) family therapy could be helpful.

In the conclusion of her report, Dr. Cottam wrote,

> As with all Juvenile Court cases: Children need permanency – a secure and stable base that will allow them to help meet their potential: If parents cannot continue to demonstrate progress and compliance with the Court's recommendations and Orders, guardianship and/or adoption must be strongly considered as in the best interests of the children.

When asked why she included that in her report, Dr. Cottam testified, "Because I believe it's extremely important for children to have [the] security of a permanency plan," "children just can't wait forever for a parent or two parents to get their act together so the child could be reunified."

Dr. Antoni Schutz, a clinical psychologist, conducted three family therapy sessions for Vincent and Jayceon in early 2020. The therapeutic goal was to increase the attachment and bond between Vincent and Jayceon. Dr. Schutz described the interaction between Vincent and Jayceon as "very playful, loving, comfortable, roughhousing and playing around, enjoying each other's company in the time that they got to spend together." She did not see anything inappropriate occur between them. Dr. Schutz opined that Vincent and Jaycon had a "healthy attachment" and a "positive bond." Caseworker Malone had asked Dr. Schutz' opinion about moving Jayceon's visits to Omaha, and Dr. Schutz believed that visitation could be moved to Omaha. According to Dr. Schutz, family therapy stopped because of COVID-19 pandemic restrictions.

Hilary Dawes was Jayceon's therapist from March 2018 through December 2020; at the time, she was a provisionally licensed mental health practitioner. When Dawes initially started

therapy for Jayceon, it was to process emotions related to visitation with his mother. Part of the treatment plan created in January 2019 was to process Jayceon's relationship with Vincent and the emotions that went along with visitation. Dawes discharged Jayceon because he had "stalled" in therapy. She and her supervisor felt that Jayceon needed "more time to get to a point where he would be able to work on processing some of his experiences and emotions," and "that comes with age at times." Dawes never saw Jayceon interact with Vincent. Dawes never communicated with Dr. Schutz, the family therapy provider.

During caseworker Malone's time on this case from August 2019 through August 2020, Vincent participated in supervised visits with Jayceon once a week in Lincoln and DHHS provided transportation for Vincent. Vincent missed a visit in September 2019, and later told Malone that he had been in jail. (According to a DHHS court report, Vincent was jailed for misdemeanor assault and battery and felony terroristic threats; all charges were subsequently dismissed). According to a DHHS court report, Vincent missed another visit in September because he was uncomfortable with the driver from the transportation company and told the driver to take him back home; the company offered to send a different driver, but Vincent declined. Vincent canceled a visit in October because the visitation company needed to pick him up 2 hours early, but he did not want to wait in Lincoln for 2 hours prior to the visit. He attended two out of four scheduled visits in November and attended all visits in December. Vincent attended all four visits in January 2020, and six out of eight visits in February (he started having two visits per week in February). Vincent attended six out of eight scheduled visits in March--he missed his transportation for one visit and canceled another due to concerns about the COVID-19 pandemic. Beginning later in March, visits were limited to video or telephone calls because of COVID-19 restrictions. In April, Vincent missed three visits--he missed one because his grandmother passed away, one he confirmed but failed to participate, and one he failed to confirm. Malone testified that for one of the missed April visits, Vincent later reported that he had been incarcerated. (According to the DHHS court report, Vincent reported that he was jailed for allegedly violating a no contact order with the mother of his youngest child; he was charged with terroristic threats). Vincent also informed Malone that he was canceling his July 1 visit because he had been shot in his hand; he said he had been at a party celebrating his birthday and shooting started. Malone said that caused her to be concerned about Jayceon's safety in Omaha and impacted her recommending that visits occur in Omaha. During Malone's time on the case, Vincent never progressed beyond supervised visitation.

At the time Malone was ready to retire in August 2020, it was her opinion that Vincent's parental rights should be terminated because he failed to make sustained progress towards the court-ordered goals and Jayceon deserved permanency.

Lisa Pollard was the children and family services specialist assigned to this family beginning in July 2021, and she was the ongoing caseworker at the time of trial. When Pollard took over the case, she had a case transfer meeting with her supervisor and the previous caseworker and that caseworker's supervisor. She also reviewed the court orders.

Pollard is required to meet with parents monthly, but since July 2021, she has only been able to meet Vincent twice in his home and once for a family team meeting at his attorney's office; Pollard also saw Vincent once or twice in court, but she was not able to have an extended conversation on those occasions. Pollard said she scheduled monthly team meetings and would

"sometimes" communicate directly with Vincent to set up the meeting, but "[f]requently" communicated with Vincent's attorney (as instructed by Vincent) to set up the team meetings.

Pollard stated that Vincent was court-ordered to have safe and stable housing and a legal source of income, submit to random drug testing, avoid behavior or conduct that might result in his incarceration, and have supervised visitation.

According to DHHS court reports received into evidence, Vincent had safe and stable housing, reported being self-employed or employed, and his tax returns were provided to DHHS. Pollard testified that she received a letter from Frank Bailey stating that Vincent completed 12 sessions of individual therapy.

According to exhibits received into evidence via stipulation, from May 15 through July 31, 2020, Vincent participated in 12 sessions of individual therapy with Bailey, "LADC, LMHP, LPC." In the therapy progress note from May 15, Bailey stated that Vincent "appears to be experiencing emotional distress dealing with CPS" and "[t]hat is where all his anger and emotional dysregulation comes from." Subsequent progress notes include statements such as: "[Vincent] has a history of entering toxic relationships, the problem[] is that[] he has poor boundaries in these relationships, and the domestic violence in these relationships appear to be mutual"; "[Vincent] is having irrational beliefs that [D]HHS does not want him to have his children back and that everyone is against him getting his children back"; "It appears that [Vincent] is consumed by this case and emotional[ly] it keeps him stuck and not being able to move forward"; "It will be difficult for [Vincent] to be [a] good parent and [a good] life partner without treatment for his complex trauma"; and "[Vincent] has not made any progress in therapy or progress in his behaviors," "[h]e has been honest throughout therapy, open to feedback, and understands the need for changes in his life[,] [b]ut he is still in the contemplative level of change." In the August discharge summary, Bailey stated: "The prognosis for [Vincent] is mediocre," he "completed therapy" but "did not make much progress in therapy."

Pollard arranged for Capstone Behavioral Health to provide drug testing for Vincent. After Capstone Behavioral Health stopped providing drug testing services to Vincent, Pollard arranged for Owens & Associates to do the testing, and at the time of trial he was still participating in drug testing with them.

David Cote is the drug testing supervisor for Capstone Behavioral Health. Cote testified that Vincent was a client from January to October 2018, at which time he was discharged for lack of testing. Vincent was supposed to test once each week, however, he completed only 11 of the 39 tests that were scheduled. Of the 11 tests that Vincent completed, all were negative for illegal substances. On cross-examination, Cote testified that all attempts to contact Vincent for testing from January through May were made to a third-party (the phone number was provided by DHHS), and Cote did not know if Vincent was actually notified about the tests. However, Cote did speak to Vincent once in March, and Vincent informed Cote that he was out of town.

Cote stated that Capstone Behavioral Health received a new drug testing referral for Vincent in March 2022, and he was a client from March 17 to May 17. However, Vincent was discharged for noncompliance after completing only 1 of the 10 tests that were scheduled during that time; the 1 test that was completed was negative for illegal substances.

Sarah Valentine is the supervisor of the drug testing department at Owens & Associates, and she manages a team of four collectors. Valentine testified that Owens & Associates had been

drug and alcohol testing Vincent since March 2017, and he was a current client. Since March 2017, Vincent has been discharged by Owens & Associates three different times (May 2017, March 2020, and May 2021) for having 30 days of nonresponse or noncompliance, and he was also discharged by Nebraska Families Collaborative in December 2017. From March 2017 through December 2022, Vincent completed only 92 of the 171 tests that were scheduled. Of the 92 tests that Vincent completed, 2 tests in April 2017 were presumptive positive for marijuana, but the other tests were negative.

Caseworker Pollard testified that when she was assigned to this case in July 2021, she learned that Vincent had not had an in-person visit with Jayceon since September 2020 and virtual visits were not going well; Jayceon was refusing a lot of the visits, and Vincent was not confirming some visits. In order to assist Vincent with in-person visits, Pollard sent a referral for a new visitation agency (she received a response in approximately October 2021) and arranged for transportation for Vincent.

Katherine Lantis was the visitation worker assigned to this case from October 2021 to October 2022. She testified that Vincent was scheduled to have one 2-hour supervised visit with Jayceon each week, either in-person or via Zoom. None of the 12 scheduled visits occurred from October through December--Vincent was unaware of one visit and canceled or failed to confirm four other visits, and Jayceon refused seven visits. When asked what kind of visits Jayceon generally did not want to participate in, Lantis replied, "Zoom visits." All five scheduled visits occurred in January 2022, but only one visit occurred in February--Vincent missed two visits because his brother passed away, and Jayceon refused one visit. Vincent missed one visit in March because he failed to confirm. He missed one visit in April because he had training for a new job. Vincent missed two visits in May because he failed to confirm. Vincent missed one visit in June because he failed to confirm. He missed three visits in July--one because his sister was in the hospital and he had to watch her children, one because he was sick, and one because transportation did not show up. All four scheduled visits occurred in August. Vincent missed two visits in September--one because he was in a car accident and did not feel well, and another when he had to take his daughter to the ER (an alternative Zoom visit was offered but he failed to log on). He missed two visits in October--one because he did not sign on to Zoom and one because he did not confirm. On cross-examination, Lantis agreed that during all of the visits, Vincent and Jayceon wanted to see each other, were physically affectionate, and engaged in age-appropriate conversations.

Caseworker Pollard testified that Vincent was currently having supervised visits with Jayceon. She has provided Vincent with gas vouchers and DHHS has paid for repairs on Vincent's vehicle. Although Pollard had been able to obtain transportation services for Vincent in the past, no agencies were currently willing to transport Vincent.

Pollard testified that it had been very difficult to work with Vincent. He did not want to listen to Pollard or take her suggestions. Pollard said that he "verbally abused" her on a number of occasions, calling her "retarded and slow."

Pollard testified that Jayceon had spent "[p]retty much his entire life" in foster care. He was placed in foster care when he was 3 months old and had remained in foster care except for 3 or 4 months when he was placed with his mother. Jayceon was currently 10 years old. Vincent had "not cooperated with rehabilitative services" or "corrected the adjudicated conditions," and he had

never progressed beyond supervised visits with Jayceon. Pollard opined that Vincent's parental rights should be terminated because Jayceon deserves permanency.

According to exhibits received into evidence, Vincent had another son, born in 2019, but his parental rights to that child were terminated in December 2022 in a separately docketed juvenile case.

Vincent testified that there were communication problems with caseworkers Malone and Pollard, they would either not answer or were not timely in their replies. Vincent was asked to explain how the lack of communication affected his case. Vincent said,

> [I]t messes up my time with my son. If I don't get to talk to them and ask them the correct questions or whatever, I didn't get everything that I was supposed to. And when I ask for more visit time or anything else, I don't get replies to that, but they reply when they want to just . . . add more stuff on to me.

When asked if Pollard reached out to him on a monthly basis to set up family team meetings, Vincent replied, "No, not every time." Vincent was willing to have team meetings, but he "hadn't had one in months." Vincent received emails from Pollard in 2023 asking to set up family team meetings, but he was not available because he was "recently in the hospital and couldn't do anything."

Vincent wanted the juvenile court to deny the GAL's motion to terminate his parental rights. He said, "I've been doing everything that y'all asked," and "I feel like y'all should give me a chance to try to raise my son."

Vincent testified that he has lived in the same home for 10 years and was the primary caregiver for his 2-year-old daughter. He had not been able to work "too much" since a September 2022 car accident, but he worked for a plastics company the 2 weeks before his accident, and prior to that he "was doing lawn service" with his brother for "the last couple years." He provided tax returns to DHHS to prove he had an income. He completed required mental health assessments, family therapy, and individual therapy.

Vincent believed he stopped using illegal substances in 2019. Prior to that he used marijuana. On cross-examination, Vincent was asked about his compliance with court-ordered drug tests. He said he might have been discharged from services "one time" for not submitting to the tests; "I mean, the amount of UAs I've taken, it's ridiculous after it's [sic] been clean for so many years. I mean, that's like bothering someone."

Sometime between 2018 and 2023, Vincent was charged with a felony, "assault or something," but the charges "got dropped." He said he was not currently incarcerated or on supervised release, and he did not have any pending criminal charges.

Vincent has always had supervised visits with his son. He said he was consistent with visits when they occurred in Omaha (based on the juvenile court's orders, visits in Omaha occurred between May and August 2018). When visits occurred in Lincoln, DHHS set up transportation for Vincent, however, his ride was late or failed to show up numerous times. (On cross-examination, Vincent was asked if transportation was ever terminated because he failed to utilize the service. He acknowledged that happened.) There were also "[p]lenty of times" when Jayceon did not show up for the visits, and Vincent had to drive back home without seeing him. During the COVID-19 pandemic, Vincent and Jayceon had video visits, but Vincent did not believe they were as effective

as in-person visits. When asked if there were times that Jayceon did not want to interact on video, Vincent replied, "Yes." When asked if he felt that he had a good relationship with Jayceon when visits were in person, Vincent said, "I know we do."

Vincent loves his son and believes they are well-bonded. Vincent believes he could effectively and safely parent Jayceon. Vincent agreed that he would continue to follow the juvenile court's orders if the court denied the motion to terminate his parental rights.

We note that on January 25, 2023 (the 7th day of the termination hearing), Vincent's counsel made an oral motion to withdraw as counsel, stating that Vincent did not believe that counsel was advocating appropriately and wanted counsel to withdraw and have new counsel appointed; the motion was overruled. Additionally on January 25, the juvenile court repeatedly warned Vincent (appearing via Zoom due to an illness) about proper decorum during the hearing and that he needed to remain on camera; Vincent became argumentative and used swear words, and the court ultimately terminated Vincent's Zoom link. On May 31 (the 11th day of the termination hearing), Vincent was removed from the courtroom for talking, which interrupted the proceedings. Vincent's counsel then orally moved to withdraw as counsel, stating that Vincent needed to be able to communicate with counsel to help his defense; the motion was overruled.

## JUVENILE COURT'S DECISION

In an order filed on August 23, 2023, the juvenile court terminated Vincent's parental rights to Jayceon after finding that statutory grounds for termination existed pursuant to § 43-292(2) and (7), and that termination of parental rights was in Jayceon's best interests.

Vincent appeals.

## ASSIGNMENTS OF ERROR

Vincent assigns, restated, that the juvenile court erred in (1) finding that statutory grounds exist to terminate his parental rights under § 43-292(2), (2) finding that termination of his parental rights was in Jayceon's best interests, and (3) denying his motion for substitute counsel.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

Jayceon's GAL sought to terminate Vincent's parental rights under § 43-292(2) and (7). The juvenile court found that both of those grounds existed by clear and convincing evidence. Although Vincent challenges the court's finding regarding § 43-292(2), he does not dispute that § 43-292(7) was sufficiently proven.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the

statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra.* Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra.* In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra.*

Jayceon was removed from his mother's care in April 2013 and remained in foster care thereafter, except for a few months in 2016 when he lived with his mother. By the time the motion to terminate Vincent's parental rights was filed on October 22, 2021, Jayceon had been in an out-of-home placement for all but a few months of the previous 8½ years. The 15-out-of-22 months' period was clearly satisfied.

The GAL has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Vincent's parental rights to Jayceon. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra.* We next consider whether termination is in the child's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Vincent has completed some of his court-ordered requirements. He has a safe and stable home, he appears to have a legal source of income, and he completed a bonding assessment, family therapy, and individual therapy (although Bailey's discharge summary stated that Vincent's prognosis was "mediocre" and that he "did not make much progress in therapy"). Vincent reported that he completed substance use treatment, however he did not provide a discharge summary to his caseworker. Additionally, the drug testing supervisors testified that Vincent was discharged from drug testing services six times for noncompliance.

Vincent's attendance at visits has been inconsistent, despite having only one visit per week. Additionally, Vincent has never progressed beyond supervised visits. There is evidence that Jayceon enjoys his visits with Vincent and that they have a bond. But having a bond with a child does not make a parent a fit person to provide parental care for him or her. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Caseworkers Malone and Pollard opined that it was in Jayceon's best interests to terminate Vincent's parental rights because Jayceon deserves permanency. We agree. At the time the termination hearing concluded, Jayceon had been in an out-of-home placement for all but a few months of the previous 10 years. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The GAL proved that Vincent was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Jayceon's best interests to terminate Vincent's parental rights.

### MOTION FOR SUBSTITUTE COUNSEL

Vincent claims that the juvenile court erred by denying his motion for substitute counsel. He asks that this court reverse and remand for a new trial with substitute legal counsel appointed for him.

On January 25, 2023 (the 7th day of the termination hearing), Vincent's counsel made an oral motion to withdraw as counsel, stating that he had received a text from Vincent that said, "'I think I need new counsel. Doesn't seem . . . you have my best interest at heart or advocating appropriate for me.'" Counsel stated he confirmed with Vincent that Vincent wanted counsel to withdraw. Counsel believed that "under the Nebraska Rules of Professional Conduct," he had an ethical obligation to bring that to the court. Counsel also believed that there had been a breakdown in the attorney-client relationship.

Vincent testified on the matter. He confirmed that counsel had been his court-appointed attorney for approximately 10 years, and that he wanted counsel to withdraw as his attorney. During questioning, Vincent said, "I did everything the courts have asked me." Vincent also asked, "[H]ow did my rights get taken from my first one when I've done everything?" Vincent did not believe that counsel was acting in his best interests and he wanted a new lawyer. On cross-examination, Vincent expressed his dissatisfaction with how slow the case had been progressing, even though he had "completed everything." He also noted that "it's not about just [Jayceon]," and that he had another child taken from him too, and he was "tired of . . . letting this court system run over me and my children." On redirect, Vincent said, "I want my kids home," and "If [counsel] can't fight for me like [he is] supposed to, then I don't want to deal with it."

The GAL also testified regarding counsel's motion to withdraw, stating, "It would be a lot easier from the [GAL's] point of view to deal with someone who would not as rigorously have filed the motions that [Vincent's counsel] ha[d] filed," or "raised the objections that [Vincent's

- 11 -

counsel] ha[d] raised in this case." The GAL said that from her standpoint, Vincent's counsel "[never] missed an opportunity to make [the GAL's] case more difficult to prove."

In arguments to the juvenile court regarding the motion to withdraw, the GAL's counsel pointed out the inevitable delay and "extreme prejudice" for Jayceon. The court overruled counsel's motion to withdraw.

On appeal, Vincent's counsel cites to Neb. Ct. R. of Prof. Cond. § 3-501.16 (rev. 2008), which provides in part:

> (a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
>
> . . . .
>
> (3) the lawyer is discharged.
>
> (b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if:
>
> (1) withdrawal can be accomplished without material adverse effect on the interests of the client;
>
> . . . .
>
> (c) A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.
>
> . . . .

Comment 5 explains, "Whether a client can discharge appointed counsel may depend on applicable law. A client seeking to do so should be given a full explanation of the consequences. These consequences may include a decision by the appointing authority that appointment of successor counsel is unjustified, thus requiring self-representation by the client."

Vincent argues that based on his testimony at the hearing, "it was clear that [he] had discharged his attorney and that the Trial Court should have granted [him] leave to either obtain separate counsel or to appoint separate counsel for him." Brief for appellant at 16.

The GAL contends, however, that "it is not clear that [Vincent] truly 'discharged' his counsel." Brief for appellee at 40. The GAL points to Vincent's testimony on redirect:

> Q [by Vincent's counsel]. Do you believe you can follow my counsel, my advice in moving forward in this case? Yes or no. Or has there been such a breakdown that we can't communicate any further?
>
> A. I mean, anything is possible, but I want my kids home. That's my main thing. If you can't fight for me like you're supposed to, then I don't want to deal with it. You ain't fighting as hard as the last case. I got two different judges. The other judge took my rights. It hurt me. I keep getting hurt.

The GAL argues that Vincent's "'discharge appears to be based upon a claim of ineffective assistance of counsel resulting in great part from [Vincent's] disappointment with the outcome of an interrelated but separate juvenile case" in which Vincent had the same counsel. Brief for appellee at 40.

- 12 -

In a proceeding to terminate parental rights, an indigent parent does not have the right to be represented by counsel of his or her own choosing; neither the mere distrust of, or dissatisfaction with, appointed counsel is enough to secure the appointment of substitute counsel. See *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 414 N.W.2d 266 (1987).

Based on our de novo review of the record, Vincent's attorney represented him fully. Counsel filed numerous motions throughout this case, and during the termination hearing counsel repeatedly objected to opposing counsel's questions, challenged exhibits, and vigorously cross-examined witnesses. The juvenile court did not err when it denied the motion to withdraw and to appoint substitute counsel.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Vincent's parental rights to Jayceon.

AFFIRMED.